**Memo Endorsement on final page (p. 30)**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOUP PARTNERS, LLC, | Civil Action No. 23-CV- 00213 |
| Plaintiff, | **ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIM,  AND CERTIFICATION PURSUANT TO L. CIV. R. 1.6** |
| vs. | |
| HUNTERS POINT AGENCY LLC, | |
| Defendant. | |

Defendant Hunters Point Agency LLC ("HP"), by and through undersigned counsel, as and for an Answer to Plaintiff's Complaint respectfully sets forth the following upon information and belief:

### INTRODUCTION

1.      HP admits that the parties entered into the MSA dated April 22, 2022 and states that the MSA speaks for itself as to the scope of services to be provided, and the purpose thereof.

2.      HP admits that DOUP procured the space for the MOW, but denies that the space was suitable for the MOW, as ultimately HP was unable to complete its work due to a stop work order ("SWO") placed on it by the Department of Buildings of the City of New York due to the actions of the landlord, not HP, at the premises.  HP further admits that it had expertise to assist DOUP in creating the MOW, and that DOUP did not have such expertise.  HP admits that it did assist with matters detailed in this Paragraph 2.

3.       HP admits that it had expertise to create the MOW.

4.      HP admits that it set an initial budget estimate based on the originally expressed demands of DOUP, but denies the remaining allegations in this Paragraph 4 because DOUP

regularly changed and often increased its design and project demands, failed to deliver its own deliverables on schedule, significantly affecting timelines and budgets, such that HP could not meet expectations that were not clearly articulated or defined.

5.     HP denies the allegations in Paragraph 5.

6.     HP lacks knowledge and information sufficient to admit or deny whether MOW is currently closed down, and therefore denies the same and demands proof thereof.  HP admits that there were delays but denies that it was the cause of such delays.

7.     HP denies the allegations in Paragraph 7.

8.     HP denies that it failed to perform.  HP admits that DOUP sent a termination notice to HP on July 18, 2022, the same day HP also sent its own termination notice to DOUP earlier.

9.     HP denies that it improperly spent money, or that there were unused portions of fees.  HP admits that it demanded DOUP pay outstanding invoices, which to date, have not been paid and are the subject of HP's counterclaim.

10.    HP states that the Complaint and DOUP's prayer for relief speaks for itself, and denies the remaining allegations in Paragraph 10.

## THE PARTIES

11.    Upon information and belief, admitted.

12.    Denied.  HP is a Pennsylvania limited liability company with its principal place of business at 1190 Princeton Ln., West Chester, PA 19380.

13.    HP states that venue is a legal conclusion of the pleader to which no answer is required.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

14.     HP lacks knowledge and information sufficient to admit or deny the allegations in Paragraph 14 relative to DOUP's desires or the timing thereof, and therefore denies the same and demands proof thereof.

15.     HP admits that the MOW project was a large undertaking for DOUP, which did not have experience in the field, but denies the allegations in Paragraph 15 to the extent that the same suggest a characterization that HP failed to or otherwise was incapable of taking on such an undertaking.

16.     HP admits that DOUP needed assistance with all aspects of the MOW project set forth in Paragraph 16.

17.     HP admits that discussions with DOUP began in or around April 2022.

18.     HP admits that it engaged with DOUP under the terms of the MSA in order to detail each party's respective rights and responsibilities with respect to the MOW project, but denies the characterization of facts set forth in Paragraph 18.

19.     HP admits that it had the expertise to carry out the MOW project, including the various aspects of the project identified in Paragraph 19.

20.     Admitted.

21.     Admitted.

22.     HP admits that it represented to DOUP that it could meet the originally agreed upon obligations set forth in the MSA, including the budget and expected time frames, but states that DOUP regularly changed its design demands, missed deadlines, changed and increased Scope of Work, significantly affecting timelines and budgets, such that HP could not meet expectations that were not clearly articulated or defined.  DOUP was advised by HP in advance

multiple times, including in the MSA, that failure on its part to adhere to the MSA, as well as conditions beyond HP's control may lead to budget increases and/or project delays.

23.     HP admits that it entered into the MSA and that the document attached as Exhibit 1 is a true and accurate copy of the MSA.

24.     HP admits that it knew that DOUP needed assistance with all aspects of the MOW project, including as set forth in Paragraph 24.

25.     HP states that the MSA speaks for itself.

26.     HP states that the MSA speaks for itself.

27.     HP states that the MSA speaks for itself.

28.     HP states that the MSA speaks for itself.

29.     HP states that the MSA speaks for itself.

30.     HP states that the MSA speaks for itself.

31.     HP states that the MSA speaks for itself.

32.     HP states that the MSA speaks for itself.

33.     HP states that the MSA speaks for itself.

34.     HP states that the MSA speaks for itself.

35.     HP states that the MSA speaks for itself.

36.     HP states that the MSA speaks for itself.

37.     HP states that the MSA speaks for itself.

38.     HP states that the MSA speaks for itself.

39.     HP states that the MSA speaks for itself.

40.     Admitted.

41.     Admitted.

42.     HP denies the allegations in Paragraph 42.

43.     HP denies the allegations in Paragraph 43.

44.     HP denies the allegations in Paragraph 44.

45.     HP denies the allegations in Paragraph 45.

46.     HP denies the allegations in Paragraph 46.

47.     HP denies the allegations in Paragraph 47.

48.     HP denies the allegations in Paragraph 48.

49.     HP denies the allegations in Paragraph 49, including each subpart.

50.     HP admits that DOUP sent the termination notice on July 18, 2022, the same day HP sent its termination notice to DOUP, but denies that it committed any breaches.

51.     HP denies the allegations in Paragraph 51, and in fact, states that it took action to prevent DOUP from incurring additional costs, including cooperation with DOUP's counsel to ensure DOUP was able to take on deliveries, and facilitation with vendors.

52.     HP denies that any monies are owed to DOUP, and states that DOUP owes it money, as reflected in the audit.

## FIRST CLAIM FOR RELIEF

### Breach of MSA (Section 1)

53.     HP reasserts each of its answers to Paragraphs 1-52 above as its answer to Paragraph 53.

54.     HP states that enforceability of the MSA is a legal conclusion of the pleader to which no answer is required.

55.     HP states that the MSA speaks for itself.

56.     HP states that the MSA speaks for itself.

57.     HP states that the MSA speaks for itself.

58.     HP denies the allegations in Paragraph 58.

59.     HP denies the allegations in Paragraph 59.

60.     HP denies the allegations in Paragraph 60.

61.     HP denies the allegations in Paragraph 61.

62.     HP denies the allegations in Paragraph 62.

## SECOND CLAIM FOR RELIEF

### Breach of MSA (Section 2)

63.     HP reasserts each of its answers to Paragraphs 1-62 above as its answer to
Paragraph 63.

64.     HP states that enforceability of the MSA is a legal conclusion of the pleader to
which no answer is required.

65.     HP states that the MSA speaks for itself.

66.     HP denies the allegations in Paragraph 66.

67.     HP denies the allegations in Paragraph 67.

## THIRD CLAIM FOR RELIEF

### Breach of MSA (Section 5)

68.     HP reasserts each of its answers to Paragraphs 1-67 above as its answer to this
Paragraph 68.

69.     HP states that enforceability of the MSA is a legal conclusion of the pleader to
which no answer is required.

70.     HP states that the MSA speaks for itself.

71.     HP states that the MSA speaks for itself.

72.     HP denies the allegations in Paragraph 72.

73.     HP denies the allegations in Paragraph 73.

74.     HP denies the allegations in Paragraph 74.

## FOURTH CLAIM FOR RELIEF

### Fraud

75.     HP reasserts each of its answers to Paragraphs 1-74 above as its answer to this Paragraph 75.

76.     HP admits that it engaged with DOUP under the terms of the MSA in order to detail each party's respective rights and responsibilities with respect to the MOW project, but denies the characterization of facts set forth in Paragraph 76.

77.     HP admits that it had the expertise to carry out the MOW project, including the various aspects of the project identified in Paragraph 77.

78.     Admitted.

79.     Admitted.

80.     HP admits that it represented to DOUP that it could meet the originally agreed upon obligations set forth in the MSA, including the budget and expected time frames, but states that DOUP regularly changed and increased its design and project demands, significantly affecting timelines and budgets, as well as DOUP's venue created conditions such that HP could not meet expectations that were not clearly articulated or defined, which HP outlined in the MSA and advised in advance that may negatively impact budget and project timeline

81.     HP denies the allegations in Paragraph 81, including each subpart.

82.     HP denies the allegations in Paragraph 82.

83.     HP denies the allegations in Paragraph 83.

84.     HP denies the allegations in Paragraph 84.

## FIFTH CLAIM FOR RELIEF

### Negligent Misrepresentation

85.     HP reasserts each of its answers to Paragraphs 1-84 above as its answer to this Paragraph 85.

86.     HP states that the nature and scope of its obligation to provide information to DOUP is a legal conclusion of the pleader to which no answer is required.

87.     HP denies the allegations in Paragraph 87.

88.     HP denies the allegations in Paragraph 88.

89.     HP denies the allegations in Paragraph 89.

90.     HP denies the allegations in Paragraph 90.

91.     HP denies the allegations in Paragraph 91.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

92.     HP reasserts each of its answers to Paragraphs 1-91 above as its answer to this Paragraph 92.

93.     Admitted.

94.     HP denies the allegations in Paragraph 94.

95.     HP denies the allegations in Paragraph 95.

96.     HP denies the allegations in Paragraph 96.

97.     HP denies the allegations in Paragraph 91.

WHEREFORE, Defendant, Hunters Point Agency LLC, respectfully requests that this Court grant judgment in its favor and against Plaintiff on all counts, award attorneys' fees and costs, and such other relief deemed just and appropriate.

## AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

1.     Following issuance of the Notice of Termination to HP, DOUP failed to mitigate its damages in a number of ways, including:

- Failure to contact vendors and manufacturers despite being provided with contact information to do so;

- Failure to timely meet prescribed deadlines and checkpoints for the MOW Project;

- Failure to accept deliveries of items, despite being advised of such deliveries by HP;

- Failure to pay additional amounts owed in order to ensure that works-in-progress from third-parties were completed;

- Failure to take necessary action to remove the stop work order ("SWO") on the venue;

- Failure to hire a competent architect of record; and

- Failure to hire a replacement agency to perform work started by HP.

2.     Thus, to the extent plaintiff sustained any losses, plaintiff failed to mitigate such losses.

## **AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

1.      DOUP retained HP to perform the services set forth in the MSA, all of which were for the purpose of creating the MOW at the venue that was chosen by, and contracted directly with DOUP.  HP had no role, nor prior advisement in selecting the venue. HP asked in the proposal phase if the venue had a current Certificate of Occupancy and DOUP said it did.  Only after HP started working on behalf of DOUP did HP discover the venue's Certificate of Occupancy had expired. HP warned to DOUP that this would create numerous complications, which may impact timeline and budget.  In June 2022, HP discovered and alerted DOUP that a stop work order ("SWO") was issued by the New York City Department of Buildings, which was not the result of any work performed by HP.  Because of the SWO, HP was prevented from performing work required under the MSA, and deliveries could not be accepted at the venue or risk further financial or usage penalty until resolved. HP researched the matter and was advised by the venue and other permitting contacts that it may take weeks, months or years to resolve. It was not in HP's SOW to resolve such matters. Because the venue was rendered unusable within the contract time period, the core purpose of the MSA, installation of a museum, was rendered impossible or impracticable.

2.      Additionally, HP had provided significant quotes and documentations of fees to DOUP for the changes and deliverables requested.  DOUP did not approve the costs and therefore HP could not deliver services and materials that were not paid.

3.      Plaintiff's claim is thus barred by the doctrines of impossibility, impracticality, and/or frustration of purpose.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

1.     The MSA includes a Force Majeure clause that states as follows:

Except for Client's payment obligations, neither Party shall be liable to the other for any delays or failure to perform as required under this Agreement if such failure is due to circumstances or causes beyond its reasonable control, including, without limitation, acts of God, fire, earthquake or natural disaster, war, terrorism, rebellion, insurrection, civil war, military action, pandemic, epidemic, government regulation, blackout or labor strike or dispute (each a "Force Majeure Event"). If the Force Majeure Event renders performance under a SoW impossible, even after the Force Majeure Event ends, either Party may terminate the applicable SoW, without liability except that Client will reimburse Hunters Point for all fees and expenses incurred prior to or as a result of the termination, including pre-approved or non-cancelable third-party obligations or expenses. (MSA, § 13).

2.     The SWO issued by the New York City Department of Buildings prevented work at the venue, and thus, was a government regulation and order that prevented performance by HP. Under the terms of the Force Majeure clause, HP is not responsible for delays or failure to perform, but DOUP remained obligated to HP for all payment obligations, including pre-approved, and non-cancelable obligations.

3.     Plaintiff's claim is thus barred by the Force Majeure provision of the MSA.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

1.     DOUP breached the MSA in numerous ways, including failure to pay outstanding monies owed to HP for services rendered, failure to provide a suitable venue for the MOW, and failure to pay for all pre-approved, non-cancelable third-party obligations incurred.

2.     DOUP's breaches predated and/or otherwise precluded HP's performance under the MSA.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

The Complaint failed to state any claim upon which relief may be granted.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

If Plaintiff is granted the relief sought by Plaintiff, Plaintiff will be unjustly enriched at the expense of Defendant.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of laches, waiver, ratification, estoppel and/or unclean hands.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to attorneys' fees as Plaintiff claims in its Complaint, whether by reason of the MSA or otherwise.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

HP asserts that it intends to rely upon such other defenses as may be available or apparent during discovery and hereby reserve its right to amend its Answer to plead said defenses.

WHEREFORE, Hunters Point Agency, LLC demands judgment dismissing Plaintiff's Complaint, along with attorney's fees, cost and disbursements of this action.

## COUNTERCLAIM

### Background

1.      Hunters Point Agency, LLC ("HP"), an event production agency, has almost thirty years of personal experience in providing live event services to clients that includes creative, strategic, design, production, technical, sponsorship, and promotional services.

2.      Specifically, HP offerings include production of live and virtual events, creative development, design, budgeting and schedules, permits and venue sourcing, talent booking and coordination, sponsorship sourcing, live event programing and direction, fabrication management,

equipment and rentals, logistics, PR coordination, marketing and promotion, ticketing, culinary programs and concessions, and event business models.

3.      HP engages with clients across all industries to put on concerts, festivals, pop ups, virtual and in-home events, livestreams, stunts, activations, immersive environments, theatrical experiences, press events, trade shows, tours, parties and premiers.

4.      In April 2022, HP was engaged by DOUP Partners, LLC ("DOUP") to perform certain services related to DOUP's pop up project called the Museum of Women ("MOW").

5.      The MOW project was a significant undertaking, and DOUP engaged HP to provide services as set forth in the MSA, described below.

6.      From the outset of the engagement, it was clear to HP as well as numerous third-parties engaged by HP that DOUP and its principals lacked significant experience when it came to a project of this nature, and DOUP had completely unrealistic expectations and goals.

7.      DOUP repeatedly engaged in behavior that made it exceedingly difficult, and in some instances impossible for HP to perform its work.  DOUP failed to meet agreed upon production and design deadlines, unilaterally rescheduled key project meetings and/or failed to have critical decision makers in those meetings, did not give HP timely access to critical resources, and hired contractors to perform services for the MOW project without first having HP review or vet such contractors.  Additionally, DOUP requested HP to take on additional SoW. All of the foregoing led to significant increases in project expenses, as well as delays.

8.      Most critically, DOUP, without HP's involvement, procured the venue for the project, located at 478 Broadway, New York, NY 10013.  However, the venue proved to be unsuitable for the project, as the New York Department of Buildings issued a Stop Work Order

("SWO") mid-project, which upon information and belief, may be in place, in addition to several open violations, rendering performance impossible.

9.      Despite all of this, HP did what it could to drive the project forward.  HP even went above and beyond to prepare a presentation for DOUP that was intended to explain the work it was doing, the various project options and the costs incurred, all as a means of educating DOUP and assisting in the project. This was in addition to the daily meetings, documents and presentations.

10.     Ultimately, DOUP grew tired of incurring costs of its own doing or did not understand how their actions increased costs, and refused to pay HP for services and materials rendered.  This led to HP terminating the Agreement with money owed to it by DOUP.

11.     Since then, HP has gone above and beyond to cooperate with DOUP, including facilitating deliveries and relationships with engaged vendors.  But, rather than take responsibility for its own incompetency and try to mitigate its expenses and move the project forward, DOUP opted to blame HP for its failures, and file its lawsuit first.

**The Original MSA and SoW**

12.     DOUP, via an individual named Stevvi Aanerud, first reached out to HP on or about April 9, 2022, and the parties began discussing the MOW Project which was presented as an RFP. Initial discussions included HP's capabilities, as well as a budget based on the RFP.

13.     An initial budget estimate was provided April 13th, further meetings were held April 15th, and DOUP provided a working concept deck to HP on April 18, 2022 with a request for HP to provide additional services and deliverables.

14.     From that point, the parties went through approximately five rounds of discussion on the scope of work and related budget matters, before reaching consensus on the original scope detailed below, and set forth in the Master Services Agreement.

15.     HP and DOUP entered into the Master Services Agreement, which was identified with an effective date of April 22, 2022, but was executed by the parties on May 2, 2022 (the "MSA").  A copy of the MSA with exhibits thereto is attached to this Counterclaim as Exhibit A.

*Project Budget and Scope of Services*

16.     Most of the detail for services to be provided under the MSA was included within the statement of work ("SoW") attached as exhibit A to the MSA, and the SoW controlled over other inconsistent terms.  (Ex. 1 at § 1, Ex. A (SoW)).

17.     The SoW provided that Hunters Point would serve as the "load in producer for the multi room installation of exhibited content at the client's New York City Venue as further detailed in the 'Budget Narrative, Timeline, and T&Cs set forth below."   (Ex. 1 at SoW, § 1).

18.     The original project budget was $1,817,673.72.  (Ex. 1 at SoW, § 4).

19.     This amount was to be paid installments as set forth in the SoW.  *Id.*

20.     The SoW also included a detailed "Budget Narrative, Timeline, and T&Cs" which provided the assumptions and detail upon which the budget was based.  (Ex. 1, SoW, § 5).

21.     The Budget Narrative, Timeline, and T&Cs identified services for which HP was responsible, and also those for which it was not (identified as OOS – out-of-service).  *Id.*

22.     As a general summary, the original budget assumptions included the following:

   a.   Venue Logistics;

   b.   Location Scout and Site Visits;

   c.   Scenic;

     d.  Lighting;

     e.  Audio;

     f.  Furniture and Décor;

     g.  Logistics;

     h.  Production Staffing;

     i.  Operations;

     j.  Travel and Expenses (Design Director – final week);

     k.  Contingency; and

     l.  Agency Operational Expenses.  (Ex. 1, SoW, § 3).

23.    The original budget assumptions <u>did not include</u> the following:

     a.  Venue procurement;

     b.  Food and Beverage;

     c.  Video/IT/Computer;

     d.  Graphics;

     e.  Front of House;

     f.  Talent;

     g.  Marketing; and

     h.  Video and Photo Assets.  *Id.*

24.    DOUP agreed that HP would have "reasonable access" to its staff and resources to the extent reasonably necessary to perform the services.  (Ex. 1, § 1, ¶ 4).

25.    DOUP was permitted to request modifications to the scope of service in the SoW, which would then be submitted to DOUP by HP via change order, amendment or addendum.  *Id.* at ¶ 9.

26.     The MSA expressly stated that "Change Orders may reflect an increase or a decrease in the level of Services (and potential correlating changes to the compensation.)" and, "the line-item fees and expenses outlined in this budget are estimated based on Hunters Point's current knowledge of the time and materials needed to complete this scope. The Client agrees that Hunters Point may shift budget dollars between line-items as necessary, provided Hunters Point stays within the identified total budget." *Id*. DOUP also expressly acknowledged that, "if milestone dates are missed may result in overages/rush fees or missed goal dates." (SoW, § 5).

27.     As part of the scope of services, HP agreed to hold at least one weekly meeting with DOUP's team, and one weekly meeting with Abby Trott, the managing member of DOUP Partners, LLC.  Both parties acknowledged that these meetings were critical forums for addressing issue and making decisions relative to the MOW project, and agreed not to move the meetings except by mutual consent, and to ensure that each party had a representative present at such meetings. *Id*. at ¶ 7.

*Venue Exclusions*

28.     As noted above, DOUP, without HP's involvement, procured the venue for the project, located at 478 Broadway, New York, NY 10013.  This was addressed in the SoW:

> Hunters Point acknowledges and agrees that the Client has executed the License Agreement that allows Client's use of the premises located at 480 Broadway, New York, NY 10013 for the MOW Project.  The License Agreement describes the premises, the use thereof and alterations and the fact that such business alterations can only be performed during business hours.  The parties further acknowledge and agree that Hunters Point was first provided a copy of the License Agreement on April 29, 2022 and that Hunters Point has not had an adequate opportunity to fully require the License Agreement prior to the execution of this Agreement and SoW. (SoW, § 1, ¶ 5).

29.     Included among the budget assumptions was that the venue would be received in accessible, ready to begin build out state/no gut or major renovations needed prior to load out,

and a Temporary Permit of Assembly (TPA) would be dependent upon the venue's own Cert of Occupancy (SoW, § 5).

30.    Additionally, among the original budget assumptions, DOUP agreed and understood that there is "risk in production work flow, however every effort will be made to stay on schedule and within budget, unless driven by factors such as this [the venue] outside of Hunters Point's control." *Id*.

31.    Among the budget assumptions were also several items that required DOUP's input, deliverables and involvement, as well as key acknowledgments, including that all estimates were based upon timely receipt of the DOUP designs and content, and client calls.  *Id*.

32.    DOUP also agreed that "changes to scope of work, including added concept developments and design iterations will be advised in advance if resulting in overage and approval prior to incurring cost or deliverable." *Id*.

*Termination and Audit Rights*

33.    The MSA provided that either party may terminate the Agreement or SoW if the other party breaches its obligations if not cured within fourteen (14) days, or in the instance of a breach of DOUP's payment obligations, within ten (10) days.  Termination notices were required to provide sufficient detail as to the basis for the termination.  (Ex. 1, § 2, ¶ 3).

34.    Upon receipt of termination, HP was required to exercise best efforts not to incur additional costs, and to limit the time that HP spent on the project, however, HP was permitted to undertake efforts that it determined were "reasonably necessary" to provide a smooth cessation of any terminated project.  (Ex. 1, § 2, ¶ 4).

35.     Upon termination, DOUP was required to reimburse HP for all pre-approved fees and expenses incurred in connection with the services, including pre-approved or non-cancelable third-party obligations or expenses.  *Id.*

36.     In addition to the foregoing termination rights, in the event of non-payment of fees owed, HP was permitted to cease providing services under the SoW until such time as payment has been made, and HP bears no responsibly for project delays occasioned by DOUP's failure to make timely payment.  (Ex. 1, § 2, ¶ 5).

37.     HP was required to retain copies of supporting documentation related to services rendered, and DOUP had a right to review the same (the "Audit").  (Ex. 1, §1, ¶ 8).

## DOUP's unreasonable conduct -  delays, demands, and changes to SoW

38.     The overall MOW Project was based upon active input from both parties in order to get from concept, to design, to implementation.

39.     Almost immediately, it became clear to HP and numerous vendors that DOUP not only did not employ competent personnel to carry out the MOW project in a timely manner, while also demanding progressively more elaborate plans and designs, without wanting to pay for it.

40.     Within a week of entering into the MSA, DOUP caused delays in the production schedule by not providing necessary designs to HP.  This led to lost time to vet and review bids for vendors.  HP repeatedly raised these concerns in emails, text messages, and meetings.

41.     HP asked DOUP if their designer needed help, and were often told reviews of new work were forthcoming, but then nothing was provided by DOUP, and deadlines were regularly missed.  HP tried to accommodate DOUP by extending deadlines to the extent possible.

42.     One particular design that raised concern initially was the "City Night" room.  The design provided by DOUP for this installation was vastly different from the original RFP for the

project, upon which the initial budget was based.  HP expressed concern that this would impact budget, suggesting that cuts could be made in other areas.

43.    For other designs that were the responsibility of HP, DOUP regularly provided very late feedback, well past the required deadline, and often, the feedback was lacking in substance.

44.    DOUP's delays and inaction drove up costs from the original budget.  One such area for cost increase was due to the need for cross checks with fabricators, fabricators having to engage in rush status to supply the custom materials and labor hours in overtime which drove cost overages, and other fabricators refusing to take on the project, limiting options.  HP advised DOUP of all of this.

45.    In addition, DOUP was contractually obligated to connect HP to third parties (e.g. artists) by the second week of May 2022.  Most were not connected to HP until after May 17, 2022, affecting the ability to determine and acquire necessary rigging, supplies, and more.

46.    DOUP continued to add creative elements to the MOW project to that were not originally included in the first SoW, including after the original "pencils down" deadline in order to meet the original project deadline.  This included approving another $264,758.16 in video SoW as well as requested to produce two room areas that were originally out of SoW.

47.    HP regularly reminded DOUP that every additional request, and many additional changes would increase costs.

48.    In late May, HP provided MOW with itemized quotes, unmarked up quotes based on only fabrication for specific rooms, not including other production items needed as well, within the MOW project noting MOW's design changes and custom, premium priced add-ons, alerting DOUP that just two (2) of the fifteen (15) planned rooms would cost as much as $550,000, almost

all of the scenic budget of $678,133.  With just eight (8) of the fifteen (15) total rooms itemized, DOUP was already $159,000 over the scenic budget.

49.     When the CEO of DOUP informed HP that she would not attend a nightly standing executive meeting to discuss the budget overages and routine problems DOUP's late behavior was negatively impacting on the project, HP advised on May 25th its intention to terminate the MSA due to DOUP's failure to adhere to the terms of the MSA.  DOUP followed up with additional meetings and requests HP to remain on the project.  HP provided a written list of all of the outstanding items DOUP needed to address, behavior it needed to correct going forward, and requested recognition that the original goal date had become unachievable. DOUP agreed it would change.

50.     On June 1, 2022 HP presented DOUP with four updated budgets and narratives outlining alternative dates and costs, all based on DOUP's expressed preferences on scenic room designs.  The alternatives presented were:

    a.   July 29th: $2.7 million quote with eight (8) exhibit rooms cut;

    b.   Mid/late August (earliest date August 18th): $2.8 million quote with five (5) exhibit rooms cut;

    c.   September 14th: $3.6 million quote; or

    d.   October 13th: $3.6 million quote.

51.     HP and DOUP met on June 2, 2022 to review the various scenarios, which included HP detailing the August scenario, with at least five (5) rooms being cut, and an updated budget of $2.86 million (including a scenic budget of $1.05 million).

52.     On June 5, 2022, DOUP responded.  They wanted project completion by August 10th, eight days earlier than HP outlined, and agreed they would cut a few small items and aim to

scale down designs.  They provided no specific feedback or questions on HP's itemized scenic

room quotes. It was also agreed that complete designs would be due from DOUP by June 10th, that

there would be no further changes to completed rooms, that DOUP would designate a single

decision maker on fabricator decisions, and DOUP would provide 24-hour turnaround time for all

approvals on cost.

     53.    Despite this, DOUP continued to request additional changes, largely additions, to

the scope of work.  Incredibly, DOUP's room designs were not or only marginally scaled down.

As an example, the City Day room design below:





JUNE 27th

54. DOUP's overall inexperience also led to cost overruns. DOUP insisted on using their own designs for certain rooms, but the designs provided by DOUP lacked detail or specifics on material call outs, making it difficult for fabricators to properly quote, and leading to increased costs later. DOUP also continued to make special requests such as hand laid permanent tile, epoxy floors and hand pounded metal cladding.

55. HP offered suggestions to DOUP on how to properly design, including scale back and simplify to fit budget and timing, but DOUP refused advice from HP.

56. A lack of communication was also a problem, as DOUP regularly failed to attend meetings, rescheduled meetings, or ignored advice presented in regular meetings scheduled by HP.

57. HP scheduled "Hot Topics" meetings on a daily basis starting May 18th, which went to bi-weekly June 7th. "All Hands" executive meetings were held weekly starting the first week of the project and remained until untenable.

58. HP also provided its initial production schedule with all deadlines on May 4th, with the revised schedule sent June 8th.

59.     Despite regular tracking and communication from HP, DOUP regularly failed to provide requested feedback, meetings were ignored, and often it would take several days to resolve key issues because DOUP did not respond.

60.     On the project side, DOUP had a bottleneck caused by the fact that it had three decision makers.  This led to work volume increasing on a truncated timeline, further leading to increased costs and a pushed target date.

61.     Issues with the venue selected by DOUP were also paramount.  As noted, HP did not select, or engage with the venue.  The venue chosen did not have an active Certificate of Occupancy or a Temporary Certificate of Occupancy, as contractually required and, contrary to what DOUP had advised.  There were significant electrical fixes and approval delays.  Mechanical files of the ceiling engineering including HVAC, electrical, structural or sprinklers were unavailable.  While these challenges can be mitigated, they create additional work and delays, which HP warned of in advance.

62.     Related to the venue, DOUP also retained an architect of record ("AOR") prior to engaging with HP, and without HP's advice.  The original AOR, Chien Dao, was unprofessional and incompetent.  HP suggested the project needed a new AOR, and HP tried to assist in engaging another AOR, but most refused to work at the venue due to the NYC Department of Buildings records of the building's violations and lack of Certificate of Occupancy.

63.     The venue proved completely unsuitable for the MOW project.  A critical issue was that the New York Department of Buildings issue of a Stop Work Order ("SWO") on the venue for failing to maintain the building in code compliance, and for filing misinformation (a hazardous material violation).  HP learned about the SWO on June 20, 2022 from a potential new AOR that the SWO had been in place since June 1, 2022.

64.     The issues in the SWO were expected to be resolved by the venue.  Managing communications and resolution for a SWO was out of SoW for HP as DOUP was the tenant, and DOUP had hired the AOR.

65.     Because of the SWO, additional delays were incurred, since any further work on the installation would have led to fines, violations, and potentially criminal charges.  In short, the SWO prevented any further performance on the venue.

66.     In early July 2022, in furtherance of its desire to find cooperative solutions for the MOW Project, HP prepared a PowerPoint PDF presentation for DOUP to detail all of the MOW project roadblocks, alerts, recommendations, budget issues, and related concerns in the past and moving forward.  A copy of this presentation is attached here as Exhibit B.

67.     Of course, consistent with its pattern of disregarding HP's advice, DOUP considered the presentation a "waste of time" and refused to engage on critical project issues.

68.     Within the presentation, HP noted that due to the SWO, continued date uncertainty, and vendor and supply availability, that certain items would need to be re-bid, that cuts would need to be made, and that drawings would need to be resubmitted.  (E.g. Some vendors expressed they may not be available if the project occurred in September or after).  Re-bidding and more services meant additional project management hours.

69.     HP also again recommended retaining a new AOR, which DOUP never engaged on.

70.     The relationship was ultimately terminated before any recommendations were carried out.

71.     Throughout this entire process, DOUP also owed money to HP, but HP continued to work in good faith.  Under the terms of the MSA, it was made clear to DOUP that timely

payment was critical to meeting project checkpoints because HP incurs expenses on a "cash neutral" basis, meaning that HP schedules to receive payment right before it is to incur project expenses.

## Contract Termination and Post-Termination Activity

72.     HP's efforts to facilitate the MOW Project and work with DOUP proved futile.

73.     On July 1, 2022, HP held a video call with DOUP personnel that included Abby Trott and her father and source of funding, Byron Trott.  On this call, DOUP, and Mr. Trott specifically, was extremely hostile toward HP's principal, Kelly Markus.

74.     By the end of the July 1st call, the parties came to an agreement to temporarily suspend services so that they could reset the discussion and clarify remaining scope, timeline, and budget, including the need for DOUP to investigate the SWO, and HP's request that DOUP continue to fund the project and pay outstanding amounts.

75.     After this call, HP set out to prepare the aforementioned presentation set forth in Exhibit C, in response to DOUP's request for detail about why the budget grew from the original quote.

76.     On July 11th, having heard no response from DOUP about the payment reconciliation or the presentation HP prepared, Ms. Markus reached out to Abby Trott because she needed approval of incremental storage costs that were necessary because HP was trying to prevent DOUP from losing assets and/or incurring penalties and other violations for disobeying the SWO.

77.     In response, HP received another hostile, factually inaccurate communication from Byron Trott.

78.     Nevertheless, HP continued to move the project forward, setting another meeting on July 15th.  Just hours before the meeting, DOUP's attorneys sent correspondence accusing HP

of a lack of transparency, and requesting specific fabricator and contractor information, for the first time, and in derivation from contractual audit rights.

79.    As this point HP determined that it was going to exercise its rights to terminate the contract, sending formal notice to Abby Trott on July 18, 2022, a copy of which is attached hereto as Exhibit D.

80.    DOUP issued its notice of termination the same day.

81.    After the contract was terminated, HP continued to cooperate with DOUP in order to ensure the efforts undertaken to-date were not a total loss.

82.    HP's efforts included facilitation of, and provision of key vendor and fabricator information to DOUP (via counsel) so that DOUP could engage with such parties directly, as required.

83.    HP timely assisted DOUP with ongoing deliveries to ensure that certain items were not lost or stolen, and so that DOUP could receive deliveries without violating the SWO.

84.    DOUP requested a full audit of amounts paid and owed under the terms of the MSA and SoW.

85.    On August 2, 2022 HP provided DOUP with a comprehensive audit response, which included a full breakdown of all accounting, and every invoice and receipt to support the same (over 200 receipts/invoices).  A copy of the Audit Spreadsheet is attached hereto as Exhibit E.

86.    The Audit provided that as of July 22, 2022, $128,013.90 was still owed by DOUP to HP.

87.    DOUP refused to pay amounts owed despite the Audit and HP's demand.

88.     DOUP then went silent.   Despite repeatedly stating the importance of quick resolution, DOUP provided no response to the audit until its trial counsel reached out to HP's attorneys on September 28, 2022, nearly two months later.

89.     The letter from DOUP's counsel absurdly demanded that all amounts paid by DOUP to HP be returned (over $1 million), and contended that "HP did not deliver on a majority of the work as required by the MSA."  The letter failed to acknowledge the volumes of intellectual property in design and technical drawings and materials HP produced as well project management service hours.

90.     Consistent with DOUP's mindset throughout the entire process, DOUP's demand ignored basic facts showing that (A) HP not only performed, but went above and beyond to work with DOUP, and (b) DOUP was largely, if not entirely responsible for every delay, cost overrun, and lack of completed deliverable.

91.     DOUP then opted to file its lawsuit in this case.

## AS AND FOR A FIRST COUNTERCLAIM

### (Breach of Contract)

92.     HP restates and realleges each of its allegations above as though set forth in this Count I.

93.     The MSA and related SoW was a valid and enforceable agreement between DOUP and HP.

94.     At all relevant times, except as prevented from doing so by DOUP, HP fully performed each of its obligations under the MSA, including provision of services, and post-termination transition of the MOW project, and compliance with the requested Audit.

95.     DOUP has breached, and remains in breach of the MSA in a number of ways.

96.     DOUP is in breach of the MSA for non-payment of services rendered in the amount of 128,013.90, plus additional fees and costs that have accrued since the original audit.

97.     In addition to non-payment, DOUP has breached the contract in numerous other ways, including:

a.  Failure to participate in meetings held by HP, and failure to have persons present at meetings that had requisite decision-making authority;

b.  Failure to provide and designate competent personnel for the MOW Project;

c.  Failure to provide reasonable access to staff and resources;

d.  Failure to meet agreed upon project deadlines and checkpoints, including making design changes and other demands after prescribed deadlines passed;

e.  Failure to provide a suitable venue for the MOW Project in an accessible, ready to build-out state;

f.  Failure to make efforts to stay within the production schedule and within budget;

g.  Failure to properly submit change orders for additions and changes to the MOW Project;

h.  Failure to engage a competent AOR for the MOW Project; and

i.  Engaging with contractors without giving HP the right to review and approve contractors in connection with the MOW Project.

98.     The forgoing has caused financial harm to HP.

WHEREFORE, Defendant/Counter-Plaintiff Hunters Point Agency, LLC respectfully requests that this Court grant judgment in its favor on its First Counterclaim, and for such other relief deemed just and appropriate.

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 1.6</u>

I, Bryan P. Couch, hereby certify pursuant to Local Civil Rule 1.6, that the above-captioned matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated:  New York, New York
        January 17, 2023

CONNELL FOLEY LLP

_____
Bryan P. Couch, Esq.
888 Seventh Avenue, 9th Floor
New York, New York 10106
Telephone: (212) 307-3700
Facsimile: (212) 262-0050

*Attorneys for Defendant*
*Hunters Point Agency LLC*

Defendant represents that it has attached the following documents to its Answer and Counterclaims:

- Exhibit 1 – The Master Services Agreement.  *See* Answer ¶ 23.
- Exhibit A – The Master Services Agreement and corresponding exhibits.  *See* Counterclaims ¶ 15.
- Exhibit B – HP's July 2022 PowerPoint presentation for DOUP.  *See* Counterclaims ¶ 66.
- Exhibit C – HP's "aforementioned presentation."  *See* Counterclaims ¶ 75.
- Exhibit D – HP's July 18, 2022 termination notice.  *See* Counterclaims ¶ 79.
- Exhibit E – HP's August 2, 2022 audit spreadsheet.  *See* Counterclaims ¶ 85.

Nevertheless, none of the above exhibits is attached hereto or has otherwise been filed in this case. By **Wednesday, July 12, 2023**, Defendant shall properly file the above exhibits as attachments to its Answer and Counterclaims.  If filing guidance is needed, counsel is directed to contact the Clerk's Office for the Southern District of New York.

SO ORDERED.

Jennifer H. Rearden, U.S.D.J.
Date: July 10, 2023